McCUTCHEN & SHUMATE, for plaintiff in error.
J. C. FAIN and W. R. RANKIN, *contra.*

---

THE GEORGIA RAILROAD & BANKING CO. *v.* CLARK *et al.*

It being exceedingly doubtful that the verdict in this case was warranted by the evidence, even as the same was submitted to the jury, and it being quite probable that in executing interrogatories for the witness upon whose testimony, if any at all, the verdict can be sustained, a mistake was made in writing his answer to an important question, which mistake may have misled the jury, the ends of justice require that the verdict should be set aside and a new trial be had.                    *Judgment reversed.*

BLECKLEY, C. J., dissenting. 1. A party whose witness has been examined by commission and his testimony reported inaccurately by the commissioners, should, if the mistake be known to the party or his counsel, have the commission re-executed before announcing ready for trial, and when necessary, should apply for a continuance to afford time and opportunity for so doing. If the

mistake were unknown until after trial, this fact must appear in order to render the mistake a legal and sufficient ground for granting a new trial. Due diligence in preparing for trial would ordinarily lead to the discovery of any material mistake of this sort in time to apply for a continuance. In the present case, the mistake was so slight as not to be capable of misleading the jury. It consisted of a single verbal inaccuracy which the context disclosed and tacitly corrected.

2. There was no abuse of discretion in denying a new trial. In strict law, the trial court committed no error in leaving the verdict to stand.

August 27, 1892.

Negligence. Railroads. Fire from locomotives. Evidence. Practice. Before Judge EVE. City court of Richmond county. February term, 1891.

Clark and Morgan, alleged to be tenants in common, sued the railroad company for damages, alleging that on or about March 15, 1888, the defendant negligently permitted a heavy growth of dry grass, weeds, trash and combustibles to accumulate and remain upon its right of way and not far distant from the land of the plaintiffs, and in the running of its cars and engines allowed and caused sparks of fire and fire to escape from said engines and to fall upon the dry grass upon and adjoining its right of way, thereby igniting the grass, weeds, trash and combustibles, causing them to burn rapidly and to spread thence to the adjoining land, when it continued to burn and to spread; that it spread from one place to another, constantly burning grass, woods, fences and other substances, until March 18th, when it reached the land of the plaintiffs and killed the trees, burnt the wood, stumps, fuel and combustible substances thereon, injured the land and greatly damaged the plaintiffs; that the company, after the fire started, negligently failed to extinguish it as could easily have been done; and that the plaintiffs were ignorant of the fire being started and of the damage it had done, until the same was over. A verdict for $400 in the

plaintiffs' favor was rendered, and the defendant moved for a new trial, which was denied.   The grounds of the motion are, that the verdict is contrary to law and evidence, and that by clerical error of the commissioner who wrote the answers to the interrogatories of Joseph A. Hill, who was one of the principal witnesses for defendant and the only one in the matter inquired about in the second of these interrogatories, the word " of " instead of " off " was written in his answer thereto ; the second interrogatory being : " If yea, please state the circumstances under which you first saw it; where the fire was, and all about it." Answer : " As I was coming from the school about two o'clock, I saw the fire burning about fifty feet of the road, burning about forty or fifty feet long." The defendant insists that this clerical error gave an entirely different meaning to the answer from that intended by the witness, and that, the location of the fire as it started being material and this being the only evidence as to such location, a new trial should be granted so that the true fact on this point could be submitted to the jury. The facts alleged in this ground were supported by the affidavit of Joseph A. Hill, which was submitted to the judge at the hearing of the motion. According to the brief of evidence he was a witness for the plaintiffs.

At the trial the testimony of plaintiff Clark was as follows : About half a mile of my land is bounded by the railroad right of way. A part of it is a mile and a half and a part two miles from Belair. We were in possession of this land in March, 1888 ; about two hundred acres of it had plenty of oak wood which, standing, was worth one dollar a cord, and there were about two and a half cords to the acre. We cut and hauled off the biggest every winter. Also there was considerable lightwood, the value of which, standing, was one dollar or one dollar and a half a cord. I get ten dollars a cord

for it in town. There is not much of anything on this land now but a parcel of little switches, on account of a fire which broke out about March 15, 1888, above my place, and was allowed to go through the woods until the 17th, and then came in on me. Mr. Morgan lived there; I did not. I did not find it out until the next day after it had burned over my place. I saw the smoke on Saturday, the 17th; first saw my land, after the fire, on Monday or Tuesday, and found that everything in the shape of oak wood was killed, and the rest would have been better if it had been killed, for it stands and does not grow. The fire extended over the entire two hundred acres. The stuff that was left after the fire was of no value to me; it is lying on the ground now. The weather was and had been for several days dry and windy. The land between mine and the center of the railroad track was in a foul condition; about August they generally cut down what they claim is the right of way; they cut fifty-five feet from the center of the track. In consequence of cutting it down in August when green, they made it rougher than the woods. Above me along the line of the railroad, the land next to it was in the same foul condition. There is a kind of rise in the railroad from Belair towards my place, and down grade from my place towards Augusta, the top of the grade being in a deep cut alongside of my place. I went over the track of this fire with Wingfield, an assessor of damages for the defendant, who came down to see the extent of the damage. There was not a break in the fire from my place to where it started. We started this side of the eight mile post (my land lies at the eight mile post), and went through Weakley's place, my place, Bailey's place and May's place. The fire started above May's place on the railroad this side of Belair where the railroad makes a curve; between that place and my place there is not a break. I do not know

how it started, nor how far back of my place it extended. The timber stood for some time and then fell; it always stands and rots off at the ground; some of it did not stand a year. The logs are still there. Some of the wood was about five inches in diameter, and it ranged from that down to a half inch. It was not a thick growth of the larger class of wood. To the far corner of my land opposite the eight mile post, is about three quarters of a mile from the road. Belair is farthest west, then the school-house, then Powell's place, and then my place.

Joseph A. Hill testified as already stated, and as follows: The fire was about half a mile east of Belair. My school is about one mile from Belair. In going to and from school between Belair and the school-house, the railroad is my regular path. I saw the fire on my way from the school, which closes between two and three o'clock. It was on the north side of the railroad; do not know whether it was on the right of way; it was about fifty feet long; do not remember any signs of it having freshly burned any portion of the right of way. I mentioned it at Belair; do not remember to whom, nor whether the defendant's station agent was present; his office was in the store. I think the fire or smoke was visible from Belair and Belair station. I made no report of it; no efforts were made to put it out that I am aware of. Two days afterwards the school-house was in danger of being burned by a fire; it was saved by strong efforts; it is on the north side of the railroad. I do not know how the fire started. I stayed a few minutes watching it; do not know that it spread over the plaintiffs' premises. Tramps and others make a thoroughfare of the railroad about this point, and frequently build fires on or near the right of way, and these fires frequently spread into the woods.

Ward, another witness for the plaintiffs, testified: I was at work around the curve from where this fire

started, and thought from what I could see that it was near the railroad. I had been at work two or three hours; do not think the sun was over an hour high, about five o'clock. Do not know what first attracted my attention; happened to look up or smell the smoke; did not go up to it. A train passed along there fifteen, twenty or thirty minutes before. I had not seen any fire before it passed. I think it consisted of about ten cars loaded with wood, and three shanty cars. The only sign the engine gave of being heavily loaded was its working steam. The right of way along the track as far as the ditch ran was clean; on the other side of the track it was foul, grown up in weeds and bushes. When I saw the fire it had burned some distance from the road. I did not go where it started. It continued to burn all that night and the next day, when the wind blew towards Belair and the fire burned that way. It was burning Thursday towards Clark's place. The wind shifted during the two or three days the fire was burning; it blew southwest the day the fire started; Thursday and Friday it blew from the west; on Saturday it changed to the east and blew hard. The growth of oak wood on this land was light; it would not go over two and a half cords per acre on the best of it. The wood on Clark's land after it was burned down was nearly all killed; where the best wood was it was the worst damaged. The part that I went through was of vigorous growth, of the size of that table leg down, of common small oak. There were about seventy-five or one hundred acres that were not damaged. The engine of the train I saw was working steam when it passed me; when they work steam, that is the time the sparks fall out. When the tramps make fires along the road, it is generally at night.

The defendant introduced the testimony of its master-mechanic, boiler-maker and track-repairer of the sec-

tion of the road in question, in brief, as follows: The appliances for preventing the escape of sparks on the defendant's engines are the best that are known, consisting of a wire netting across the top of the exhaust-pipe, and nothing can pass through that exceeds an eighth to three sixteenths of an inch, unless there is some defect in the netting. To obviate defects they are inspected every trip, and if anything is the matter they are repaired. The whole locomotive is inspected, and these parts especially. Careful and competent men are selected. Nothing but a small spark can get through the netting. In 1888 a much finer or smaller netting was employed, but it was so fine as to interfere with the draft. Fifteen or twenty engines a day ran over the road. It is possible for a spark or coal of fire to come from the engine through the ash-pan. The ash-pans in use are among the best. Extra care is taken to throw the overflow from the injector into the ash-pan, tending to extinguish any fire that may fall in the ash-pan. "If any fire does escape, these precautions fail to drop [it] into the water; the tendency, if blown out of these ash-pans, is to fall right down on the right of way, though the wind may blow it to one side." From the record of inspections made about March, 1888, it appears that for a month after this occurrence the engines that went over the line showed no defects. The cinders will wear the netting out in the course of time; it is worn out also by the very high heat to which it is subjected. The track-repairer looks generally after the right of way; he cuts the bushes down about the last of August so that they can rot; he burns off a great deal of them; does all he can to keep the right of way in good condition, cleaning up anything which, in his judgment, is liable to be a kindling-place. He had orders to clean up the right of way where anything accumulated upon it, and obeyed those instructions. This grass sometimes grows up

after it is cut down.    He cut the grass and bushes forty, fifty, probably sixty feet from the center of the track, every year about the first or middle of August.    Does not know whether he had burned it off the August before the fire, but is positive he cut down the bushes and grass ; when he cuts them off he leaves them there, unless they are very thick.    An ordinary spark would not set on fire these bushes, unless they were very thick or the spark very large.

J. B. CUMMING and BRYAN CUMMING, for plaintiff in error.

J. R. LAMAR, *contra*.